ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

KELSEY C. DAVIDSON (CABN 322323)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-6959
     Fax: (415) 436-7027
     kelsey.davidson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 23-CR-00449-SI |
|     Plaintiff, | ) |
| | ) **SUPPLEMENTAL MEMORANDUM IN** |
|   v. | ) **SUPPORT OF UNITED STATES' MOTION** |
| | ) **FOR DETENTION** |
| LEION BUTLER, | ) |
|     a/k/a Christopher Butler, | ) Date:   December 18, 2023 |
|     a/k/a Leniyah Butler, | ) Time:   10:30 a.m. |
| | ) Court:  Hon. Alex G. Tse |
|     Defendant. | ) |
| | ) |

## I.      INTRODUCTION

On December 5, 2023, a federal grand jury in the Northern District of California returned a one-count Indictment charging the defendant, Leion Butler, with one count of second-degree murder in violation of 18 U.S.C. § 1111.  Dkt. 12.  The defendant was previously charged via complaint with violations of 18 U.S.C. §§ 1111 and 2 – Aiding and Abetting Murder.  Dkt. 1.  The government filed a Memorandum in support of its motion for detention on December 5, 2023.  Dkt. 14.  On December 14, 2023, the detention hearing was continued to December 18, 2023.  Dkt. 17.  Since filing its memorandum, the government has learned additional information that supports its motion for detention.

## II.     ADDITIONAL FACTUAL INFORMATION

Pursuant to a federal search warrant, the defendant's phone was seized and searched.  In one conversation, the defendant discussed purchasing a gun with an unidentified person (Subject 1) on November 2-3, 2023.  An excerpt of the conversation is below:

Butler:       How much was the gun

Subject 1:    It was 500 and it don't matter i need it it the only small on I got

Butler:       K

Butler:       I'm at mom's house

Subject 1:    Ill be there

Butler:       K

Butler:       Lea, can I give you 500 for it?  I need it when you come

Butler:       Pls

Butler:       My circumstances

Butler:       Rm

Subject 1:    yup 550 ill give u the bullets too

[negotiations over the price of the gun occur] . . .

Subject 1:    I'll give it to you 450 without the bullets I know u don't know shit anout [*sic*] guns but if u was to actually find that gun itll be over 1000 cuz that better version of a 380 it hold mini 9mm bullets bigger that [*sic*] a 380 and ur not gonna find them bullets no where cuz u gotta rare gun jot many like it had to get the box from the gunstore 130 u already stole now u wanna get over even im tryna work with u

Butler:         500

The defendant continues speaking with Subject 1 about the purchase of the gun.  At one point, the defendant states, "He ruined my life now I'm ruining his."  The conversation continues about logistics and ultimately ends with Subject 1 arriving at the defendant's house.

At one point in the conversation, the defendant sent Subject 1 screenshots of her text message conversation with another individual ("J").  A further review of the defendant's conversation with "J" shows that the defendant was extremely angry with J over personal reasons.  On November 7, 2023, the defendant asked J whether he had money for her, and J sidestepped the question.  In response, the defendant wrote, "It don't matter Bitch, because if not, you're gonna die."  J replied that he was waiting on something, and the defendant responded, "I'm deathly not playing with you.  We can settle this right now.  Bitch, you ruined my life.  Do you have some money or something to pay off the damages that you don't bitch?  What are you gonna die!"

Additionally, in jail calls in early December, the defendant repeatedly discussed murdering the Victim and continued to show no remorse for doing so.  In one conversation, the defendant was speaking to an unnamed person on the phone.  The two of them discussed writing a letter in support of her release.  The unnamed person suggested that the defendant say she felt sorry for what happened.  The defendant responded, "Say that.  Say that I apologize to anyone I hurt, but my life was in danger, and I felt like I had to defend myself in that moment or it would have been me."[1]  US-LB-005575.  After a brief pause, the defendant continued, "I don't think I should say sorry to nobody because bitch, I don't feel sorry for smoking him, he tried it, the fuck."  *Id.*  The unnamed person interjected saying the defendant should apologize, and the defendant replied, "no girl, don't say sorry to nobody bitch."  *Id.*

In another conversation, the defendant discussed the case with her mother and repeated her sentiment that the Victim got what he deserved.  The defendant stated, "I used to like feel bad for doing bad shit, like you know? . . . But girl, I don't feel like nothing, I don't feel like shit . . . I don't feel like I'm in the wrong.  Period.  I don't. . . . I don't feel like I'm in the wrong . . . I just feel like, girl, he got what he deserved."  US-LB-005594.

---

[1] These quotations refer to statements the defendant made in recorded jail calls.  These statements are summarized as I heard them on the recorded calls.

### III.   ARGUMENT

This additional information further supports the government's argument that the defendant is a danger to the community.  The defendant's continued lack of remorse demonstrates the serious danger she would pose to the community should she be released.  The defendant has repeatedly stated, over a length of time, that she believes she was in the right and the Victim got what he deserved because he disrespected her.  The defendant was willing to murder someone simply because the Victim took her "out of her element" to Crissy Field and she "did not want to walk" home in the cold.  If she were to be released, the community would be placed at significant risk: should the defendant perceive any other slight insult against her, it seems clear she would be willing to pull the trigger yet again.

This danger is exacerbated by the knowledge that the defendant likely obtained a gun approximately nine days before she murdered the Victim.  In her post-arrest interview with the FBI, the defendant admitted that she used her own .380 caliber gun to murder the Victim.  She explained that she had gotten this gun from a third party for protection and that she gave the gun back to the same third party after the murder.  The defendant also stated that she later attempted to get the gun back from him.  The newly discovered text messages show that the defendant obtained a 9mm gun in addition to the .380 caliber gun (believed to be the murder weapon) that she possessed.  In connection with her attempt to obtain this second gun, the defendant sent screenshots of text messages of her conversation with J.  These text messages show that the defendant was extremely angry with J for a personal reason.  Given the context in which the defendant shared these screenshots, there is a strong inference that the defendant wanted the gun to retaliate against J.

The above information, combined with the facts laid out in the government's memorandum in support of detention (Dkt. 14) clearly show that the defendant poses a danger to the community.

### IV.   CONCLUSION

As detailed above and in the government's memorandum in support of detention, the defendant is a danger to the community and a flight risk.  The Court should order the defendant detained pending trial.

//

//

1    DATED:  December 15, 2023                Respectfully submitted,

2                                             ISMAIL J. RAMSEY
                                              United States Attorney
3

4                                             _/s/ Kelsey C. Davidson_____

5                                             KELSEY C. DAVIDSON
                                              Assistant United States Attorney
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28