UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LEION BUTLER, a/k/a LENIYAH BUTLER,<br><br>Defendant. | Case No. 23-cr-00449-SI-1<br><br>**ORDER RE: DEFENDANT'S MOTIONS TO SUPPRESS AND GRANTING ADMINISTRATIVE MOTIONS TO SEAL**<br><br>Re: Dkt. Nos. 49-51, 53, 55, 62 |

On July 8, 2024, the Court held a hearing on three motions to suppress filed by defendant Leniyah Butler. For the reasons set forth below, the Court DENIES the first and second motions, and GRANTS in part and DENIES in part the third motion. The Court also GRANTS the administrative motions to seal.

**DISCUSSION**[1]

I. **First Motion to Suppress**

Butler's first motion to suppress seeks to suppress "the illegal fruits and tainted evidence derived from the government's searches of messages on Ms. Butler's cellular phone that were undisputably beyond the scope of the search warrant for the phone." Mtn. at 4 (Dkt. No. 50). The government contends that Butler's motion is moot because the government does not intend to introduce the text messages at issue in its case in chief.

Based upon the government's representation that it does not seek to introduce the text messages, the Court concludes that defendant's motion is moot. *See United States v. Kahre*, 737

---

[1] The parties' briefing lays out the facts and the Court does not recount them in this order except as necessary to resolve the pending motions.

1  F.3d 554, 565 (9th Cir. 2013) (affirming district court's ruling that motion to suppress was moot
2  because the evidence at issue was not introduced at trial). The Court DENIES defendant's request
3  for "an inquiry" regarding the manner in which the government conducted its search of defendant's
4  cellular phone, without prejudice to renewal in the event defendant moves to suppress any other
5  evidence that defendant contends was impermissibly seized outside the scope of the search
6  warrant(s).

## II.     Second Motion to Suppress

Butler's second motion to suppress seeks to suppress "the illegal fruits and tainted evidence derived from the government's warrantless search and seizure of automated license plate reader ('ALPR') data collected by the company Flock Safety ('Flock') from public and private surveillance of vehicles, including Ms. Butler's own family jeep, in violation of her Fourth Amendment right to privacy." Mtn. at 2 (Dkt. No. 51). The government contends that Butler lacks standing to challenge the FBI's query of the Flock database because the query was directed at the Jeep Commander owned by Butler's mother, not Butler. Alternatively, the government contends that the FBI's query of the Flock database is not a search for Fourth Amendment purposes.

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978); *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). "The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." *Byrd v. United States*, 584 U.S. 395, 410-11 (2018).

Butler contends that she has standing to challenge the FBI's query of the Flock database because her mother's Jeep Commander was "the family car" used to transport family members, including herself. As support, Butler has submitted the declaration of Leslie Blueford, Butler's mother and the registered owner of the Jeep Commander. Blueford states,

> I am the registered owner of a Jeep Commander, CA 5XIK537. I purchased it in October 2023. I use it as a family car, meaning that I use it to drive around my family including my daughter, Leniyah Butler. Leniyah thus had access to the car when she needed a ride somewhere.

Blueford Decl. ¶ 1 (Dkt. No. 51-5).

In *United States v. Thomas*, 447 F.3d 1191 (9th Cir. 2006), the Ninth Circuit held that "a defendant who lacks an ownership interest may still have standing to challenge a search, upon a showing of 'joint control' or 'common authority' over the property searched." *Id*. at 1198 (citing *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980)). "Common authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" *Id*. (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). In *Portillo*, the Ninth Circuit held that the driver of a car had standing to challenge the search of the car's trunk, even though he did not own the car, because the driver had "permission to use his friend's automobile and the keys to the ignition and the trunk, with which he could exclude all others, save his friend, the owner." *Portillo*, 633 F.2d at 1317. However, the passenger in the same vehicle lacked standing to challenge the search because he asserted neither a possessory nor property interest in the vehicle. *Id*.; *see, e.g., United States v. Whitehead*, 428 F. Supp. 2d 447, 451 (E.D. Va. 2006) (husband had standing to challenge search of his wife's car even though he neither owned it nor had a driving license where husband provided money for fuel and maintenance of the vehicle, kept personal items in the vehicle, used the vehicle as his primary mode of transportation, and had the authority to have others drive him places in the vehicle).

The Court concludes that Butler has not shown she has standing to challenge the search of the Flock database because Butler has not shown that she had "joint access or control for most purposes" over the Jeep Commander. It is undisputed that Butler is not the owner of the Jeep Commander. Butler has not submitted a declaration saying that she ever drove the vehicle or that she had driven the car during the time period covered by the Flock database search,[2] and Blueford's

---

[2] The government's opposition states that law enforcement queried the Flock database for black Jeep Commanders between October 31, 2023 and November 16, 2023, and that the database contained 42 images of Blueford's vehicle in twelve locations during that time period.

3

1    declaration does not state that Butler ever drove the Jeep Commander. Instead, Blueford states that
2    the Jeep Commander was the "family car" and that Butler "had access" to the vehicle "when she
3    needed a ride somewhere." The Ninth Circuit has held that simply having access to a vehicle, or
4    being a passenger in a vehicle, is insufficient to confer standing to challenge a search of that vehicle.
5    *See Portillo*, 633 F.2d at 1317. Butler has not cited any cases in which courts have held that a
6    defendant has standing to challenge the search of a vehicle under similar facts. To the contrary, the
7    cases that are most analogous involving GPS tracking hold that simply being a passenger does not
8    create a Fourth Amendment privacy interest in the vehicle that is tracked. *See, e.g.*, *United States*
9    *v. Cabrera*, 651 Fed. App'x 118, 122 (3d Cir. 2016) (holding defendant lacked standing to challenge
10   the installation of a GPS tracker to monitor a vehicle because he was "a mere passenger in the
11   vehicle and had no protected property interest in it when the GPS device was installed or at any time
12   thereafter"); *United States v. Barraza-Maldonado*, 879 F. Supp. 2d 1022, 1028 (D. Minn. 2012)
13   (holding defendant lacked standing to challenge installation of GPS tracker because "it is undisputed
14   that Barraza did not own, possess, or have any type of property right in the Maxima when the DEA
15   agent installed the GPS device"). Accordingly, the Court concludes that Butler has not shown that
16   she had a reasonable expectation of privacy in her mother's Jeep Commander.[3]

## III. Third Motion to Suppress

19   After the FBI arrested Butler, agents transported her to the FBI office where she met with
20   two FBI agents in an interview room. The agents and Butler spoke for approximately seven minutes
21   before agents advised Butler of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). After
22   she was advised of her *Miranda* rights, Butler gave a detailed confession over the next hour and

---

[3] However, even if Butler did have standing to bring the current motion, the Court agrees with the analysis of Judge Breyer in *United States v. Rubin*, 556 F. Supp. 3d 1123, 1127-30 (N.D. Cal. 2021), that the query of the Flock database did not constitute a Fourth Amendment search under the facts of this case because the 42 images provided by Flock did not permit law enforcement to "track every movement that [defendant] made in the vehicle" during the time period searched. *United States v. Jones*, 565 U.S. 400, 430 (2012) (holding the installation of a GPS device on a target's vehicle and use of that device to monitor the vehicle's movements constituted a "search" under the Fourth Amendment because "for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving.").

1    approximately 45 minutes.  Butler seeks to suppress her un-*Mirandized* statements, as well as the
2    statements she made after the *Miranda* warning under the theory that the FBI agents engaged in an
3    impermissible two-step interrogation under *Missouri v. Siebert*, 542 U.S. 600 (2004) (plurality
4    opinion); *see also United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006) (holding that under
5    *Siebert*, "a trial court must suppress postwarning confessions obtained during a deliberate two-step
6    interrogation where the midstream *Miranda* warning—in light of the objective facts and
7    circumstances—did not effectively apprise the suspect of his rights").

8          The government contends that Butler's pre-*Miranda* statements were not the product of an
9    interrogation, and thus that there was no need to give the *Miranda* warning at that time.  The
10   government argues that the pre-*Miranda* statements included small talk and statements by the FBI
11   agents explaining to Butler why she had been arrested, and that Butler repeatedly interrupted the
12   agents and made voluntary, spontaneous statements.  As to Butler's post-*Miranda* statements, the
13   government argues that Butler knowingly and voluntarily waived her rights, and that the FBI did
14   not engage in a deliberate two-step interrogation.

16         **A.**    **Pre-*Miranda* Portion of Interview**

17         "In order to combat [the pressures inherent in custodial interrogation] and to permit a full
18   opportunity to exercise the privilege against self-incrimination, the accused must be adequately and
19   effectively apprised of his rights."  *Miranda*, 384 U.S. at 467.  "A *Miranda* warning functions both
20   to reduce the risk that an involuntary or coerced statement will be admitted at trial and to implement
21   the Fifth Amendment's self-incrimination clause."  *Williams*, 435 F.3d at 1152.  "Thus, if a suspect
22   in custody does not receive an adequate warning effectively apprising him of his rights before he
23   incriminates himself, his statements may not be admitted as evidence against him."  *Id*.

24         There is no dispute that Butler was in custody when she made the pre-*Mirandized* statements.
25   The question is whether Butler was being "interrogated" prior to those warnings.  "'Interrogation'
26   means that the 'questioning is initiated by law enforcement officers after a person has been taken
27   into custody . . . ."  *Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir. 1989) (quoting *Miranda*,
28   384 U.S. at 444).  "It not only includes express questioning but also its functional equivalent."  *Id*.

"A functional equivalent of questioning is any statement or conduct which the police should know 'is reasonably likely to elicit an [inculpatory or exculpatory] response from the suspect.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 & n.5 (1980)). "The 'response from the suspect' refers to any statement or non-verbal act which might be used against the suspect in court." *Id.* Excluded from the definition of "interrogation" are words or actions "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301; *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir. 1984) (stating "this circuit has suggested that when an officer informs a defendant of circumstances which contribute to an intelligent exercise of his judgment, this information may be considered normally attendant to arrest and custody").

The Court has watched the entire recorded interview and read the draft transcript. As to the pre-*Miranda* portion of the interview, the Court finds that some of the discussion is a combination of small talk (such as the agents asking Butler if she is comfortable and needs water) and statements attendant to arrest and custody (agents showing Butler the arrest warrant). However, and while it is a close call, the Court finds that some of the pre-*Miranda* statements by the agents are the functional equivalent of questioning because the agents should have known that they were likely to – and in fact did – elicit incriminating statements by Butler.

Specifically, after the agents and Butler had been speaking for several minutes, and in response to Butler asking "You know? Obviously you have some like, some details that ya'll got me, so it's like, a story," the agent responded,

> "Mhm. Yeah, one hundred percent. And that's what we'd like to talk to you about today. Umm, so our intention today is to talk to you, get to learn a little bit more about you, because our job here in the F-B-I, is to find the truth, right? That's all we're concerned about is the truth."

Davidson Decl., Ex. 2 at 5 (Dkt. No. 58-1). In response, Butler stated, ""Is this- is- I just wanna- I just wanna hear ya'll's story so I can explain. 'Cause I don't like, I don't just walk around murdering people, ya know?" *Id.* at 6. Butler and the agents continued to have a back-and-forth, with Butler repeating that she wanted to hear what the FBI agents had to say. The agent responded,

> "No – no, I appreciate that. That – that actually talk – that's so, the – the – in a lot of cases we don't talk to people because we just – the F-B-I doesn't work on hunches and stuff, right? We build solid cases, and – I don't wanna say we're better or anything than local police departments, we're just not the same, right?

6

>Umm, and part of our job is to learn the truth, and part of that truth is learning about the people involved, right? So, if someone accuses you of a crime, like- we wanna know who you are, and, you know- you- you're not just a number or just like a- a- a person in handcuffs. You're- you're a unique individual, right? You have your own story and umm- you're a unique set of experiences and things like that. And that's part of what we're interested in today. . . ."

*Id*. at 6-7. In response, Butler made several more statements such as "I understand this is a really serious situation" and "I don't care" before the agents gave her the *Miranda* warning.

Under the circumstances here, the Court finds that the agent's statements about "finding the truth" and "in a lot of cases we don't talk to people because . . . the FBI doesn't work on hunches and stuff" and "our job is to the learn the truth, and part of that truth is learning about the people involved," when "someone accuses you of a crime" are the functional equivalent of interrogation. These statements were likely to elicit an incriminating response because unlike small talk or objectively neutral statements that are completely unrelated to the crime for which Butler had been arrested, these statements imply that Butler was involved in H.W.'s killing and called for a response – the "truth" – about Butler's involvement. *See State v. Gonzalez*, 302 Conn. 287, 298-99 (2011) (officer's statement that it was defendant's "opportunity to talk to us and tell his side" of the story was functional equivalent of interrogation); *see also Phillips v. State*, 425 Md. 210, 223-24 (similar); *Kinney v. United States*, 286 A.3d 1027 (D.C. App. 2022) (encouraging a suspect to tell his side of the story "is not casual conversation," and constitutes interrogation); *cf. Martinez v. Cate*, 903 F.3d 982, 994-95 (9th Cir. 2018) (holding "all I wanted was your side of the story. That's it. OK. So, I'm pretty much done with you then. Um, I guess I don't know another option but to go ahead and book you. OK. Because," and "your [sic] going to be booked for murder because I only got one side of the story. OK," constituted functional equivalent of interrogation because "Detective Navarro causally links Martinez's assertion of his constitutional right [to counsel] to the detective's decision to book the suspect for murder."). Accordingly, the Court GRANTS Butler's motion to the extent she seeks to suppress statements she made prior to being given the *Miranda* warning.

### B.   Post-*Miranda* Statements

However, the Court finds unpersuasive Butler's contentions that she was subjected to a deliberate two-step interrogation and that she did not waive her *Miranda* rights before providing a

7

confession. As an initial matter, while the Court has found that some of the agents' pre-*Miranda* statements constituted the functional equivalent of interrogation, the facts of this case differ markedly from those involving "two-step interrogations." Here, there were only a few statements by agents that the Court views as the functional equivalent of interrogation, and Butler did not confess or provide any detailed information about her involvement in H.W.'s killing prior to the agents reading Butler her *Miranda* rights. Instead, all of Butler's statements during the pre-*Miranda* portion can be characterized as general and non-specific, and most of Butler's statements during this time period consisted of her asking the FBI agents to "explain" and tell their "story" because she also had a "story."

In contrast, in cases involving deliberate two-step interrogations, agents first interrogated a suspect and obtained a confession or specific incriminating details, then provided the *Miranda* warnings and obtained a "second" confession based upon information learned during the initial un-*Mirandized* interrogation. *See Seibert*, 542 U.S. at 604 (2004) ("This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda*[,] the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time."); *see also United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (holding agents engaged in two-step confession where the "initial round of interrogation was specific and complete . . . questions and accusations touched upon the timing, location, and drugs involved in the disputed transaction, including Barnes's role in the transaction"; "Barnes's pre-warning responses were specific"; and "[t]he subject of the pre- and post-warning confession different only slightly"); *Williams*, 435 F.3d at 1150 (agents "asked [suspect] questions until he confessed; then, immediately after his oral confession, they read him his *Miranda* rights and asked him to write down what he had previously told them."). There is nothing about the pre-*Miranda* portion of the FBI interview that resembles a deliberate interrogation.

In addition, the record reflects that Butler knowingly and voluntarily waived her *Miranda* rights. After FBI Agent Atneosen read Butler her *Miranda* rights, Butler said "I just wanna get over

8

it.  I don't even care about all that.  I understand. . . I just wanna try to like, start telling you stuff 'cause I (UI)."  Davidson Decl., Ex. 1 at 15:35; Ex. 2 at 9.  Special Agent Atneosen stated that he respected that, and told her that she could sign the form if she wanted, and asked her, "do you want to talk to us?"  *Id*.  Butler nodded and raised her eyebrows.  Smith Decl. at ¶¶ 6-7 (Dkt. No. 58-3); Atneosen Decl. at ¶¶ 5-6 (Dkt. No. 58-4).  The fact that Butler did not sign the written waiver does not undermine the knowing and voluntary nature of her waiver.  *See Berghuis v. Thompkins*, 560 U.S. 370, 388-89 (2010) ("[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his Miranda rights, waives the right to remain silent by making an uncoerced statement to the police."); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (express waiver of *Miranda* rights is not required and "waiver can be clearly inferred from the actions and words of the person interrogated").  At no point during the lengthy post-*Miranda* portion did Butler state that she wished to speak to a lawyer or that she wanted to invoke her right to remain silent.  To the contrary, both before the *Miranda* warnings were provided and after, Butler repeatedly stated that she wanted to speak to agents.  *See United States v. Moreno-Flores*, 33 F.3d 1164, 1170 (9th Cir. 1994) (holding repeated statements made by a suspect after he was arrested and given *Miranda* warnings were voluntary and admissible).

Accordingly, the Court DENIES Butler's motion to suppress statements she made after the agents provided the *Miranda* warnings.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendant's first and second motions to suppress and GRANTS the third motion to suppress the pre-*Miranda* statements and DENIES the third motion to suppress the post-*Miranda* statements.

**IT IS SO ORDERED**.

Dated: July 16, 2024

SUSAN ILLSTON
United States District Judge

9